Carl Wescott
PO Box 190875
San Francisco, CA 94966
*in propria persona*
+1 415 335 5000

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

Carl Wescott,                              **C V   17   7371**   DMR

         Plaintiff      )   Case Number

-------------------- versus -------------------- )   COMPLAINT FOR BREACH OF CONTRACT &

Darrell Bushnell and                       )   SLANDER OF TITLE

Amy Bushnell,                              )

         Defendants  )

   And DOES 1 to 50,                      )

         Defendants  )

Plaintiff Carl Wescott, proceeding pro se, complains of Defendants Darrell Bushnell and

Amy Bushnell ("the Bushnells") in support of his complaint, the Plaintiff states as follows:

## PARTIES

1. The Plaintiff is an individual who is in San Francisco, California.

2. The first Defendant, Darrell Bushnell is an American citizen but a resident of Nicaragua.

**COMPLAINT FOR BREACH OF**
**CONTRACT & SLANDER OF TITLE**

3. The second Defendant Amy Bushnell is another American citizen, who is Darrell Bushnell's wife and upon information and belief resides with him in Nicaragua.

4. All relevant acts by Darrell Bushnell were undertaken for the benefit of the marital community with Amy Bushnell and all relevant acts by Amy Bushnell were undertaken for the benefit of the marital community with Darrell Bushnell.

5. In addition, upon information and belief, there are more Defendants currently unknown to Plaintiff, which shall emerge with the benefit of legal discovery. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, Mr. Bushnell and Ms. Bushnell, as individuals, in addition to acting for himself and herself and on his and her own behalf individually, as well as for the benefit of the marital community, are and were acting as the agents, servants, employees, and/or representatives of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the actions, failures to act, breaches, conspiracy, and misappropriations alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and all of the Defendants.

## JURISDICTION

6. This Court has jurisdiction pursuant to 28 USC 1332, there being diversity of citizenship and the amount in controversy exceeding $75,000 exclusive of fees and costs.

## VENUE

7. Venue is proper in this Court because it is the agreed-upon-venue in Plaintiff's purchase contract, which Defendants have impeded with their wrongful actions.

8. This case is about three related contracts ("the Contracts") to purchase property, including a condo and lots in Nicaragua ("the Properties"). The Bushnells as purchasers (via Pensco Trust and their IRA) signed two contracts ("the Two Bushnell Purchase Contracts") with identical compulsory arbitration provisions to purchase their lots and condos within the residential subdivision known as Seaside Mariana ("Exhibits A and B"). When the Bushnells had an issue with the owner of Seaside Mariana (the seller in their contracts) the Bushnells breached their contracts (that required arbitration) by proceeding directly to court, failing and refusing to arbitrate. They then improperly obtained judgment and filed a lien against not only the Properties but the full lands of Seaside Mariana. (Though their purchase contract was via their IRA, the Bushnells sued individually).

9. The third contract is Plaintiff's purchase contract to purchase Seaside Mariana. Plaintiff has obtained seller-financing for 80% of the purchase price from the owner of Seaside Mariana, and Plaintiff has arranged an investor to fund the other 20% and closing costs. Plaintiff wishes to keep the terms of his purchase confidential at the present time, but will

**COMPLAINT FOR BREACH OF
CONTRACT & SLANDER OF TITLE**

3

supply it to the Court at the appropriate time. For now, under penalty of perjury, Plaintiff hereby confirms that he has a valid signed purchase contract to purchase all of the remaining lots and lands of Seaside Mariana.

10. As such, as the Purchaser of all of Seaside Mariana, some of the provisions of the Two Purchase Contracts expressly inure to his benefit, including the arbitration provisions. The Bushnells breached their contracts by virtue of obtaining a judgment without arbitrating and then wrongfully slandered the Seaside Mariana's title by filing a lien on the Properties (rather than arbitrating as their contracts required).

A. The Parties' Contract

11. The Bushnells entered into the Lot Purchase Contract in December of 2006 and the Condominium Purchase Contract in December of 2007. Again, true and correct copies of the contracts are attached hereto as Exhibits "A" and "B".

12. Each contract contains a compulsory arbitration provision. See Section 7.12 of the Lot Purchase Contract contract and Section 6.12 of the Condominium Purchase Contract.

13. Per Section 7.4 of the Lot Purchase Contract and Section 6.4 of the Condominium Purchase Contract, all contractual rights inure to the benefit of assignees. The Plaintiff is assignee of the rights of Seaside Mariana Spa and Golf Resort, SA, the seller and counter-party on the Contracts (hereafter "the Seller").

B. The Bushnell's Breach

14. A dispute arose between the Bushnells and the Seller of Seaside Mariana after the Two Purchase Contracts were signed.

15. Rather than arbitrate the dispute as the contract required, the Bushnells proceeded to improperly obtain a default judgment (in which the Seller of Seaside Mariana has not been served) via a lawsuit in Nicaragua in 2013.  They did not arbitrate.

16. The Bushnells then used the improperly obtained judgment to file a wrongful lien on all of Seaside Mariana. A true and correct copy of a recently obtained Libertad De Graveman for Seaside Mariana is attached hereto as Exhibit "C".  A Libertad De Graveman is like a title report, which in a property purchase in Nicaragua, should show that the subject property is free and clear of liens and obligations (literally, from the Spanish, "free of taxes").

17. As a direct result of the improperly obtained judgment and lien, the Plaintiff cannot close on his purchase.  If the Plaintiff could close on his purchase, he has a significant economic opportunity to solve the current issues that forced the Seller of Seaside Mariana to sell in a distressed sale.  In solving those issues for the benefit of members of the Seaside Mariana community, Plaintiff would stand to benefit financially (if he had marketable title, which is currently blocked by the Bushnells).

18. At trial one or more licensed appraisers and real estate brokers familiar with the area will testify as to the amount of damages the Bushnells have caused by breaching their contract and slandering the Seaside Mariana title.  One such expert, a licensed real estate appraiser

with 45 years experience, including decades of experience as an expert witness in similar matters, has informed Plaintiff that the proper way to calculate that number is through a discounted net present value cash flow analysis of Plaintiff's opportunity to sell the remaining lots in Seaside Mariana (after solving a few issues that the Plaintiff is mostly done solving already).

## COUNT I BREACH OF CONTRACT

19. The Plaintiff realleges paragraphs 1-17 as if fully set out herein.

20. Under United States and California law the arbitration provisions in the Two Purchase Contracts were valid and enforceable. *California Arbitration Act Section 1280; Federal Arbitration Act, 9 USC 1 et seq.*

21. Though Plaintiff, a US citizen, is suing two other US citizens with English language contracts under US law and an agreed-upon San Francisco venue, given the location of the subject property and the residence location of the two Defendants, Plaintiff has also examined Nicaraguan law on these issues. Under the *Nicaragua Code of Civil Procedure Sections 542-552* and the *Nicaraguan Law on Mediation and Arbitration dated 25 May 2005*, the arbitration provisions in the Contracts were valid and enforceable.

22. The Bushnells breached Section 7.12 of the Lot Purchase Contract and Section 6.12 of the Condominium Purchase Contract by proceeding to Court without arbitrating their dispute with the Seller of Seaside Mariana.

23. As a direct and proximate result of the Bushnell's breach, the Plaintiff is unable to close his purchase. If he were able to close his purchase, he would not have marketable title or

**COMPLAINT FOR BREACH OF
CONTRACT & SLANDER OF TITLE**

6

be able to obtain clean title insurance on the subject properties of Seaside Mariana.  The

Plaintiff has been damaged, with the amount of his damages equivalent to the number that

will be obtained through a discounted net present value cash flow analysis of Plaintiff's

opportunity to sell the remaining lots in Seaside Mariana.

## COUNT II SLANDER OF TITLE

24. The Plaintiff realleges paragraphs 1-17 as if fully set out herein.

25. The Bushnells' lien is a non-privileged publication that falsely disparages the Plaintiff's

beneficiary rights and beneficiary title to the Properties.

26. Because of the nature of title risk and title insurance, the practical effect of the Bushnells'

disparagement is two-fold:  first, it blocks Plaintiff's ability to complete his purchase.

Second, it calls into question the quality of Plaintiff's title with respect to each property in

the Seaside Mariana residential subdivision of which the Bushnells' Properties represent a

small part.

27. The Plaintiff cannot close his purchase and will not be able to obtain clean title insurance

with respect to any property in the development so long as the Bushnells' disparagement

of his title persists.

28. Clean title insurance is particularly important – essentially, absolutely necessary - in Latin

American land titles sold and marketed to North American titles

29. As a direct and proximate result of the Bushnell's breach, the Plaintiff cannot close his

purchase.  If he were to be able to close his purchase subject to the Bushnell lien he would

be left with unmarketable title.  The Plaintiff has been damaged, with the amount of his

damages equivalent to the number that will be obtained through a discounted net present

value cash flow analysis of Plaintiff's opportunity to sell the remaining lots in Seaside

Mariana.

WHEREFORE, Plaintiff prays that this Court enter Judgement:

(a) As to Count I for damages caused by the Bushnell's breach of contract in an amount to be

proved at trial.

(b) As to Count II I for damages caused by the Bushnells' slander of Plaintiff's title in an

amount to be proved at trial.

(c) And for such other and further relief as this Court deems just.

Respectfully submitted,

Carl  Wescott, pro se

12/23/2017



EXHIBIT A

# NICARAGUA DEVELOPMENTS S.A.

## OFFER TO PURCHASE BETWEEN:

### SEASIDE MARIANA SPA & GOLF RESORT S.A.

### AND

### DARRELL BUSHNELL AND AMY BUSHNELL



# OFFER TO PURCHASE – BEACHFRONT CONDOMINIUM BUILDING I

## SEASIDE MARIANA SPA & GOLF RESORT

## MUNICIPALITY OF SAN RAFAEL, NICARAGUA

Upon acceptance of this Offer by the Vendor, to be signed within the seven days upon receiving this document, there shall be a binding agreement for the Purchase and Sale of the "Purchased Property" as defined in this contract. The Closing Contract will be signed when all conditions required in this Agreement are met.

**Between:**   **SEASIDE MARIANA SPA & GOLF RESORT**   **(the "Vendor")**
                                      **S.A.**

**And:**     **DARRELL BUSHNELL AND AMY**               **(the "Purchaser")**
             **BUSHNELL**

**WITNESSETH THAT WHEREAS:**

A.    The Vendor is the proposed seller of freehold title to certain condominium apartment units within a future beach front building that is going to be located within the development Seaside Mariana Spa & Golf Resort (hereinafter referred to as "The Project") situated in the Municipality of San Rafael Del Sur, Nicaragua. A Master Condominium Regime Declaration that contains the rules applicable to the owners within the project is being developed and will be submitted to the corresponding registry. A copy of these rules will be provided as soon as the final version is duly recorded.



- - 2 - -

B.    The Vendor has planned to build a number of Condominium Buildings within The Project. The first one that is going to be built, is the Beachfront Condominium Building I (hereinafter referred to as "BCB I") located on the south side of the proposed Beach Club Area within the presented Master Plan for the Seaside Mariana Spa & Golf Resort. BCB I will contain the following type of units: A) 1 bedroom unit with an area of approximately 800-850 square feet; B) 2 bedroom units with a total area of approximately 1400-1450 square feet and; C) 3 bedroom units with a total area of approximately 1700-1750 square feet. The Vendor will provide a copy of the floor plans to the Purchaser once these are completed. The Purchaser will acquire 2 type C unit(s). The BCB I will be subject to particular covenants, rules and regulations that will be established by special Condominium Regime Declaration update that contains the rules applicable to the owners within the building that will be submitted to the corresponding registry. A copy of these rules will be provided as soon as the final version is duly recorded.

C.    Construction is scheduled to start on November 2009, and it is expected to be completed in November, 2010.

D.    The unit(s) chosen by the Purchaser will be collectively known as the "Offered Property".

E.    The Purchaser offers to purchase all of the Vendor's right, title and interest in and to the "Offered Property", including the rights referred to under Article 1.1 "The Purchased Property" on the terms and conditions hereinafter set forth.

## ARTICLE 1 - PURCHASE AND SALE

### 1.1.   THE PURCHASED PROPERTY

The Purchaser hereby agrees to purchase from the Vendor, on the terms and conditions herein contained, the following:

(a) A good and marketable freehold title of the "Offered Property": 2 type C unit(s) of BCB I, by means of a Nicaraguan Public Deed;

(b) The right to clear and free access from public roads to the "Offered Property" over internal roads of The Project to BCB I. Internal roads will be designed and built with appropriate drainage to allow year round access.

(c) The right to Electricity connection at the time of delivery of the "Offered Property". Monthly electricity charges will apply at the corresponding rates.



- - 3 - -

(d) The right to fresh water service. There will be a connection fee at time of hook up of USD $1,000.00 per unit at the time of delivery of the "Offered Property". Monthly water charges will apply at the corresponding rates.

(e) The right to telecommunications infrastructure that allows telephone and internet service connection at the time of delivery of the "Offered Property". Monthly telephone and internet charges will apply at the corresponding rates.

(f) Home Owner's Association memberships:

i.- Seaside Mariana Home Owner's Association (SMHOA): The initial cost related to the Homeowner's Association for individual lots/units within The Project is an estimated annual fee of USD $700.00 per lot/units. These fees will be reviewed each year and will be determined by the Home Owner's Association and the Developer, and may increase according to needs of the Development. These fees include among others, the costs for security, landscaping, maintenance of infrastructure, insurance of the common areas, and general management for The Project.

Owner will begin paying SMHOA dues in January 2009, but will be prorated based on the percent of infrastructure complete at the time.

    25% upon completion of sewer

    25% upon water availability

    25% upon power availability

    25% upon completion of "adoquin" or asphalt paved roads

ii.- BCB I Owner's Association (BCBIOA): In addition to the Homeowner's Association fees related to Seaside Mariana Spa & Golf resort maintenance, the BCB I Owner's Association Fee to cover security, landscaping, maintenance of the building, insurance of the common areas, and management of BCB I, estimated in an annual fee of US $1,200.00 per unit. Fees may vary between units depending on size and location.

BCBIOA dues will not be payable until the "Purchased Property" as defined in this section is delivered to the "Purchaser" in the agreed terms. Payment for the entire year is due upon closing.

Owner's Association fees are not related to Club (Beach/Golf) Membership fees.

(g) Golf memberships for each unit are included in the Purchase Price. The Purchaser will sign a separate Contract to acquire membership for each unit in



- - 4 - -

the community. Golf Club memberships will provide unit owners access to Club facilities which include access to pool, restaurant and beverage facilities, gym and golf course facilities as defined in the Club Membership Agreement. Expected membership dues are of US $300 per month. Club dues will be waived to the Purchasers for a 10 year period from the date the Golf Course opens to the public. This is a personal benefit and will not be transferable to subsequent owners. Club dues will be charged on a quarterly basis by means of automatic credit or debit card charge. In case the unit is transferred, the Club Membership will expire and the new unit owner will have to acquire a Club Membership.

The Club Membership is a non equity membership and transfer to subsequent unit Purchasers will be regulated in the Club Membership Agreement. This benefit is personal and non-transferable to subsequent unit owners.

(h)     Once the BCB I Condominium Regime is created, the Vendor will request title insurance for each unit for a coverage per unit of US $250,000.00.

(i)      The Purchaser will receive a US $2,000.00 travel credit for two to visit Nicaragua, towards air travel and hotel costs.

Collectively, the "Purchased Property", free and clear of all liens, charges and encumbrances.

### The Purchase Price

The Purchase Price payable by the Purchaser to the Vendor for the "Purchased Property" shall be One Hundred and Seventy Five Thousand United States Dollars (USD $175,000.00) the "Purchase Price", subject to the adjustments described herein and net of any withholding tax or any other deduction that might be applicable. As this is an international transaction all amounts are in United States Dollars.

### 1.2.  PAYMENT OF THE PURCHASE PRICE

Subject to the adjustments described herein, the Purchase Price will be payable by the Purchaser as follows:

a) The Purchaser will pay a deposit of Eighty Seven Thousand Five Hundred United States Dollars (USD $87,500) on or before December 31, 2007.

b) The Purchaser will pay the balance of the Purchase Price, Eighty Seven Thousand Five Hundred United States Dollars (USD $87,500) on or before June 15, 2008. Upon completion of Deposit, The Purchaser will qualify to obtain as a bonus a lake lot to be transferred upon final payment.



- - 5 - -

c) Failure to comply with any of the above conditions set forth in section 1.2. subsections a or b, will immediately void all terms and conditions set forth in this agreement unless otherwise agreed in writing between the Purchaser and the Vendor. The Reservation Deposit will remain on the final property of the Vendor as non-refundable.

d) Closing Costs: All cost of fees associated with the transfer of land will be paid by the Purchaser such as legal, registration and taxes totaling on average 3% of the purchase price (1% transfer tax; 1% legal fees; 0.25% Registration Fees; 0.75% Notary Fees). 1% of the Purchase Price towards Closing Costs shall be transferred at the time the balance of the Purchase Price is sent by the Purchaser. The balance of 2% of Purchase Price towards Closing Costs shall be paid on or before the Closing Date.

e) All other cost of fees associated with the transfer of funds will be paid by the Purchaser such as bank fees or wire transfer fees.

f) The attorney of record is the firm Consortium - Taboada & Asociados. Specifically, Carlos Taboada Rodriguez, who may work with other associates. He may be contacted at telephone number: 011-(505)-254 5454; email: ctaboada@consortiumlegal.com; Website www.consortiumlegal.com.

g) The Purchaser will either sign the documents personally or will deliver in writing or by mail a Power of Attorney according to instructions provided by Consortium – Taboada & Asociados, the Nicaraguan law firm ("The Firm") that will prepare and provide all contracts and documents that are necessary to execute this Agreement and complete the transfer of the "Purchased Property" to the Purchaser. These contracts are listed on letter h) below. Consortium – Taboada & Asociados will also provide the Notary and Registration Services to complete the legal transfer of the "Offered Property" to the Purchaser, unless the Purchaser appoints independent firm for his representation from the approved attorney list provided by the Vendor attached in Schedule B. In case the Purchaser appoints independent firm from the approved list, the Notary and Registration Fees referred in Section 1.2 will be paid to the independent firm chosen by the Purchaser.

h) The Contracts to be signed by the Purchaser are:

a. The Offer to Purchase;

b. A Nicaraguan Public Deed of Promise of Sale (optional), once the following events have occurred:

    i. The Master Condominium Regime for Seaside Mariana Spa & Golf Resort is registered;



- - 6 - -

ii. Confirmation of selected unit(s) by the Purchaser;

c. A Nicaraguan Public Deed Purchase Agreement, which may be known also as "Purchase Closing Deed", to complete and close the transfer of the "Offered Property" between Seaside Mariana Spa & Golf Resort S.A. and the Purchaser. Closing, as defined in Section 5, will take place once the following events have occurred:

i. The Condominium Regime registry information is updated containing BCB I description;

ii. BCB I floor plan survey is approved by the Cadastre Office;

iii. The Condominium Regime for BCB I is registered;

Once the "Purchase Closing Deed" is signed, registration process in Nicaragua can take between 3 to 9 months.

d. The Master SMHOA Agreement if applicable.

e. The BCBIOA Agreement if applicable.

f. The Club Membership Agreement(s).

In Nicaragua, the following requirements have to be met, according to Nicaraguan law, to complete Real Estate property transfers:

i. A Surveyed Map must be approved by the Cadastre Office (in this case, the BCB I floor plans);

ii. Real Estate property transfers must be executed by Public Deed before a Nicaraguan Public Notary (1 day);

iii. Cadastre officials issue a Cadastre Certificate and also, evaluate the value of the property for tax purposes (usually within 4-8 weeks after Purchase Closing Deed is signed).

iv. Transfer tax must be paid (1% of transaction value or Cadastre appraisal, whichever higher) (1 day);

v. Registry fees must be paid (1 day);

vi. The Public Deed must be presented for registration before the Property Public Registry (registration time for the Managua Registry currently is between 3-9 months).

All Public Deeds in Nicaragua require personal signature of the parties, or signature by a person duly authorized with a Power of Attorney, in this case, representing The Purchaser. The Purchaser must either be present in Nicaragua or

- - 7 - -

grant this Power of Attorney according to instructions that will be provided, before the Public Deeds are signed.

### 1.3. ADJUSTMENTS

Adjustments can be expected with respect to:

(a) taxes, registry fees, utilities, licenses or any other Government or Municipal charges related to this transaction;

(b) payments under the Approved Service Contracts;

In the event that the property taxes to be adjusted have not yet been determined by the local authority, then the taxes will be adjusted on the basis that the present years taxes will be ten (10%) percent higher than the past years taxes. Any adjustments not finally determined at the date in which the "Purchase Closing Deed" is signed will be based upon reasonable estimates supplied by the Vendor, and any readjustments will be promptly made following the final determination of such amounts. The 10% tax is an estimate on annual property tax increases. Annual taxes are due by June 30 each year. Taxes for 2006 on all Seaside Mariana lands have been paid by the Developer. The Purchaser responsibility regarding real estate tax will commence on June 30, 2010 and it is recommended that The Purchaser retain counsel for all future payments.

If any dispute arises with regard to the adjustments referred to in this clause either before or after the Closing Date, the matter in dispute will be referred in the first instance to the auditors of the Purchaser and Vendor for determination. If such auditors cannot agree on a determination of the matter in dispute within ten (10) days after the reference to them, the matter in dispute shall be referred to a single arbitrator mutually agreed within five (5) days. The Vendor and Purchaser shall make any references mentioned herein expeditiously and shall share all arbitration costs as apportioned by the arbitrator. If the parties do not reach an agreement, the arbitrator will be appointed by the President of the Nicaraguan Chamber of Commerce. The arbitration shall be governed by the Nicaraguan Law of Arbitration and Alternative Dispute Resolution.

### 1.4. PURCHASER

The Purchaser may designate one or more natural persons, corporations or other legal entities for the acquisition of the "Purchased Property".



- - 8 - -

The Nicaraguan legislation does not restrict foreigners from acquiring property in Nicaragua. Nevertheless, in case local Nicaraguan Government, Municipal or Registry applicable laws and rules require, at the time of Closing, residency for foreigners to acquire land in Nicaragua, the Purchaser will designate one or more natural persons, corporations or other legal entities that meet the requirements for the acquisition and registration of the "Purchased Property". The Purchaser should have their Power of Attorney (POA) prepared when they are in country to help complete closing procedures, or deliver these with sufficient anticipation.

## ARTICLE 2 - REPRESENTATIONS AND WARRANTIES

### 2.1. REPRESENTATION AND WARRANTIES OF THE VENDOR

The Vendor hereby represents and warrants to the Purchaser, with the intent that the Purchaser shall rely thereon in entering into this Agreement and in concluding the purchase and sale contemplated herein, that as of the date hereof (unless otherwise specified) and the Closing Date in which the "Purchase Closing Deed" is signed (unless this agreement is earlier terminated):

(a)    Status of Vendor

 (i) The Vendor is a Nicaraguan Corporation, Sociedad Anonima (S.A.) and has the power and authority to enter into this agreement and to carry out the transactions contemplated hereby;

 (ii) The Vendor has purchased the Lands from which the "Offered Property" will be divided and sold to the Purchaser.

 (iii) There is no claim or litigation pending or, to the knowledge of the Vendor, threatened with respect to the Vendor, the "Purchased Property" or the occupancy or use thereof by the Vendor which could affect the right of the Purchaser to own, occupy and obtain revenue from the "Purchased Property" or the ability of the Vendor to perform its obligations hereunder;

 (iv) Neither the execution of this agreement nor its performance by the Vendor will result in a breach by the Vendor, of any term or provision or constitute a default under any indenture, mortgage, deed of trust or any other agreement to which it is bound;

 (v) The Vendor is a Nicaraguan S.A. within the meaning of the Income Tax Act of Nicaragua;

(b)    Property Taxes

- - 9 - -

 (i) There are no local improvement charges or special levies against the "Purchased Property" nor has the Vendor received any notice of any such proposed local improvement charges or special levies;

 (ii) All municipal taxes, rates, levies and assessments with respect to the "Purchased Property" are paid in full or will be adjusted as provided under the heading "Adjustment" above and there is no pending appeal or other proceedings in respect of any such taxes, rates, levies and assessments;

(c) There are neither buildings nor leases on the Lands.

(d) The Approved Service Contracts

 (i) Seaside Mariana Spa & Golf Resort S.A., directly or indirectly, will provide Club management and Home Owner's Association management services such as surveillance, gardening, road maintenance, among others, for common areas located within the "Lands" at a pre-determined amount each year based on last years operating expenses.

(e) General

 (i) Neither the "Purchased Property", nor any part thereof, has been expropriated or condemned, nor has the Vendor received any notice of any proposed expropriation or condemnation;

 (ii) There are no collective agreements or proceedings under the Labor Code of Nicaragua involving the Vendor or its employees which would become an obligation of or be binding upon the Purchaser.

## ARTICLE 3 - COVENANTS

### 3.1. COVENANTS OF THE VENDOR

The Vendor hereby covenants and agrees with the Purchaser to:

(a) Cause the "Purchased Property" to be maintained as may be required prior to the Closing Date in the manner of a prudent owner;

(b) Not enter into or amend any contract in respect of the "Purchased Property" including, without limitation, leases or service contracts, prior to the Closing Date without the prior written approval of the Purchaser;

(c) Grant authorizations reasonably required by Purchaser to authorize municipal and statutory authorities to release information confirming compliance with laws,



- - 10 - -

by-laws and other statutory and governmental regulations and in respect of potential statutory liens;

(d) Pay as and when the same becomes due any indebtedness of the Vendor to any governmental authority which, by operation of law or otherwise becomes a lien, charge or encumbrance on the "Purchased Property" from and after the Closing Date, including without limitation, corporation capital taxes, municipal taxes, and workers' compensation payments;

(e) Not modify, amend or cancel any of the encumbrances agreed to herein without the prior written approval of the Purchaser;

(f) Provide the Purchaser with continuing access to the "Purchased Property" and to all records and other documents relating to the "Purchased Property" as are in the possession or control of the Vendor which are not delivered to the Purchaser on or before the Closing Date.

### 3.2. COVENANTS OF THE PURCHASER

The Purchaser hereby covenants and agrees with the Vendor to:

(a) Comply with this Agreement, pay the Purchase Price, and sign the "Closing Purchase Deed";

(b) Comply with the Condominium Regime Rules;

(c) Sign and comply the Club Membership Agreement;

(d) Comply with all Home Owner's Association rules and regulations.

(e) Comply with the BCB I Condominium Owner's Association rules and regulations.

## ARTICLE 4 - RISK

### 4.1. THE PASSING OF RISK

The Purchased Property shall be at the risk of the Vendor until completion of the Closing pursuant to the Closing Arrangements.



- - 11 - -

## 4.2.  MATERIAL LOSS

In the event of a total material loss or damage to the "Purchased Property" occurring prior to the passing of risk aforesaid, which cannot be substantially repaired or replaced prior to the Closing Date or failing this, within sixty (60) days from the date of occurrence, the Vendor shall give written notification to the Purchaser and the Purchaser may within seven (7) days following receipt of such notification, by notice in writing terminate this Agreement, (in which case the Purchase Price will be refunded to the Purchaser from Insurance proceeds, in the corresponding proportion and neither party shall be under any further obligation to the other) in default whereof the Purchaser shall be deemed to have elected to complete the Purchase in which case the proceeds and the right to receive the proceeds of all insurance shall be assigned by the Vendor to the Purchaser on the Closing Date and the Vendor shall have no responsibility to the Purchaser to repair the damage.

## 4.3.  LOSS OR DAMAGE

In the event of loss or damage to the "Purchased Property" occurring prior to the passing of risk aforesaid, which can be substantially repaired or replaced prior to the Closing Date or failing this, within sixty (60) days from the date of occurrence, the Vendor shall diligently repair at its sole cost and expense any damage caused to the "Purchased Property" in a manner consistent with that of a prudent owner of similar property.

## 4.4.  REPAIRS NOT COMPLETE

In the event of any repairs not being completed by the Closing Date, the amount of insurance proceeds therefore shall be assigned to the Purchaser on the Closing Date and the Vendor shall provide such security to the Purchaser on the Closing Date as may be reasonably required by the Purchaser in order to ensure that such damage will be repaired and/or replaced and paid for in full.

## 4.5.  CONSTRUCTION INSURANCE

To comply with this Section, Vendor will insure the construction of BCB I.



- - 12 - -

## ARTICLE 5 - CLOSING ARRANGEMENTS

### 5.1.  THE CLOSING

The Closing refers to the transfer of title for the "Offered Property". The procedure of the purchase and sale of the "Purchased Property" will commence once the BCB I architectural designs are completed and approved by the local authorities. The Vendor then will proceed to update the Seaside Mariana Condominium Regime containing the BCB I description and rules, updating the same time the Project's Condominium Regime. The Vendor will submit the approved BCB I survey and the description of BCB I to the Public Registry of Managua. Once the Seaside Mariana Condominium Regime is updated, and the construction of the "Offered Property" is completed, the Vendor will notify the Purchaser. The property transfer will take place with the signature of the "Purchase Closing Deed" within 7 days after the Seaside Mariana Condominium Regime is registered and the Vendor notifies the Purchaser the "Offered Property" construction is completed. This will occur on or before November 30, 2010 (the "Closing Date").

### 5.2.  DOCUMENTS OF THE VENDOR

On or before one week of the Closing Date, the Vendor will deliver to the Purchaser the following items:

(a) Draft of the Purchase Closing Deed, substantially similar to the text included as Schedule B, which is the Nicaraguan equivalent of an Estate in Fee-Simple, transferring the "Purchased Property" to the Purchaser free and clear of any lien, charge or encumbrance other than Permitted Encumbrances;

(b) Copy of the survey of the "Offered Units" duly approved by the Cadastre Office;

(c) The Vendor's Statement of Adjustments if applicable;

(d) Assignments of any approved service contracts;

(e) An assignment of any licenses or permits required in connection with the operation of the Lands if applicable;

### 5.3.  PREPARATION OF CLOSING DOCUMENTS

The closing documents contemplated above will be prepared by the Vendor's solicitor (to the extent that preparation is required) and delivered to the Purchaser at least one week prior to the Closing Date. Vendor's solicitor will be the firm of record: Consortium - Taboada & Asociados. Specifically Carlos Taboada Rodriguez. He may be contacted at phone number: 011-(505)-254



- - 13 - -

5454;        email:        ctaboada@consortiumlegal.com;        Website
www.consortiumlegal.com.

## 5.4. CLOSING PROCEDURE

Closing will take place with the transfer of the "Purchased Property" from Seaside
Mariana Spa & Golf Resort S.A. to the Purchaser by means of the "Purchase
Closing Deed". The Purchaser will sign directly or duly represented before the
Public Notary indicated by the Vendor.

### Concurrent Requirement

It is a condition of the Agreement that all requirements relating to Closing
referred to above are deemed to be concurrent requirements and it is
specifically agreed that nothing will be completed on the Closing Date until
everything required to be paid, executed and delivered on or before the Closing
Date has been so paid, executed and delivered.

## 5.5. PAYMENT OF FEES AND POSSESSION

The Purchaser shall bear 100% of the costs of the conveyance and Nicaraguan
Property Transfer Tax. The Vendor shall deliver vacant possession of the "Offered
Property" to the Purchaser on the Closing Date subject only to the Permitted
Encumbrances.

## 5.6. POST CLOSING PROCEDURES

The following working day after Closing, as long as transfer costs are provided
and received by the Vendor, the attorney of record, Consortium – Taboada &
Asociados, will start registration process of the "Purchase Closing Deed(s)", unless
the Purchaser requests an independent attorney from the Vendor's approved
firm's proceeds with registration.

## ARTICLE 6 - MISCELLANEOUS

## 6.1. TIME AND TENDER

Time shall be of the essence of this agreement and the transactions
contemplated herein. Seller will not be responsible for delays caused by third
party, public utility companies, cadastre, registry or any other Public Office
response time.

- - 14 - -

Any tender of documents or money may be made upon the party being tendered or upon its solicitors; money may be tendered by wire transfer of funds or by cash, payable in United States of America funds or as provided herein, care of Seaside Mariana Spa & Golf Resort S.A.

### 6.2. RELATIONSHIP OF THE PARTIES

Upon acceptance of this Offer by the Vendor there shall be a binding agreement for the purchase and sale of the "Purchased Property" between the Purchaser and the Vendor in accordance with the terms and conditions hereof.

### 6.3. NOTICE

All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally or facsimile or may be forwarded by first class prepaid registered mail to the addresses set forth below. Any notice delivered or sent by or facsimile shall be deemed to have been given and received at the time of delivery. Any notice mailed as aforesaid shall be deemed to have been given and received on the expiration of five (5) business days after it is posted or addressed to the any direction included in Schedule A or addressed as follows:

(a)     to the Purchaser at:
        Attention: Darrell Bushnell and Amy Bushnell
        Address: Schedule A

(b)     to the Vendor at: Seaside Mariana Spa & Golf Resort S.A.
        Attention: Juan Rueda
        e-mail: juan@nicaraguadevelopments.com

Provided that any party shall be entitled to designate another address by giving notice thereof to the other party in accordance with the terms hereof, any notice so mailed shall be deemed to have been received, except during a period of interruption of normal postal service, on the fifth business day following the date of mailing in the city of Managua, Nicaragua.

### 6.4. SUCCESSORS AND ASSIGNS

This Agreement shall ensure to the benefit of and are binding upon the parties hereto, their respective heirs, executors, administrators and other legal representatives and, to the extent permitted hereunder, their respective successors and assigns.



- - 15 - -

## 6.5.  EXTENDED MEANINGS AND HEADINGS

Words importing the singular number include the plural and vice versa and words importing the masculine gender include the feminine and neuter genders. The headings are for convenience of reference only and shall not effect the construction or interpretation of this agreement.

## 6.6.  APPLICABLE LAW

This agreement shall be interpreted in accordance with the laws of Nicaragua.

This agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and contains all of the representations, and warranties, covenants and agreements of the respective parties, and may not be amended or modified except by an instrument in writing executed by all parties. This agreement supersedes all prior agreements, memoranda and negotiations between the parties.  The Schedules attached hereto form part of this agreement.

## 6.7.  BUSINESS DAY

(a) "Business Day" shall mean a day on which the Property Public Registry in which title to the "Purchased Property" is registered is open for business;

(b) In the event that the Property Public Registry is not open for business on the Acquisition Date or Closing Date, these Dates shall be the next day the Property Public Registry is open for business.

## 6.8.  TIME AND FURTHER ASSURANCES

All times herein refer to current Nicaraguan Time. Each of the parties shall, at the cost and expense of the other party, execute and deliver all such further documents and do such further acts and things as the other party may reasonably request from time to time to give full effect to this agreement.

## 6.9.  NON-MERGER AND INSPECTIONS

None of the provisions of this agreement shall merge in the transfer of the "Purchased Property" or any other document delivered on the Closing Date and the provisions of this agreement shall survive the Closing Date.  From the date of acceptance of this Offer, the Purchaser shall have the right to inspect and survey the "Offered Units" and carry out reasonable tests.

- - 16 - -

## 6.10. FORCE MAJEURE

For the purposes of the agreement arising from the acceptance of this Offer, "Event of Force Majeure" means, but is not limited to, acts of God or of the public enemy, wars, declared or undeclared, revolution, riot, insurrection, civil commotion, fires, floods, storms, slides, epidemics, quarantine restrictions, strikes or lock-outs, including illegal work stoppage or slow downs, freight embargoes or power failure; Government acts, confiscation, government, legal or municipal restrictions that might arise, new findings such as cultural findings or hydrocarbons, in the Lands, that might result in restrictions to its use and other rights, among other circumstances, provided that any such event or circumstances is a major disabling event or circumstances which is beyond the reasonable control of the party affected and results in a material delay, interruption or failure by the affected party in carrying out its duties, covenants or obligations under the agreement formed by the acceptance of this Offer. No lack of money, financing or credit shall be deemed to be an Event of Force Majeure.

If an Event of Force Majeure occurs or is likely to occur, the party directly affected shall promptly notify the other party of the particulars of the relevant event or circumstances and, if possible, supply supporting evidence.

The party so affected shall use its best efforts to remove, curtail or contain the cause of the delay, interruption or failure and to resume with the least possible delay compliance with its duties, covenants and obligations under the agreement formed by the acceptance of this Offer. Neither party shall be liable to the other for any delay, interruption or failure caused by an Event of Force Majeure, and the date specified herein for the performance of such duties, covenants or obligations hereunder shall be postponed for a period equal to the delay occasioned by such Event of Force Majeure.

## 6.11. CONFIDENTIALITY

This Agreement, together with any other private Agreement between the parties, as well as any other document, electronic file, picture or image provided by Seaside Mariana Spa & Golf Resort S.A., and related companies, regarding the development and the aforementioned Agreements is deemed confidential and cannot be disclosed to third parties without the written consent of Seaside Mariana Spa & Golf Resort S.A. Likewise, Seaside Mariana Spa & Golf Resort S.A. can not disclose to third parties any information regarding the Purchaser without previous written consent.

- - 17 - -

This does not apply to any information that is in the Public Domain, or information that might be needed to disclose to third parties for the full and complete enjoyment of the Purchased Property.

## 6.12. ARBITRATION

Any conflict arising from the interpretation, execution or breach of this Agreement shall be resolved by Arbitration, held before La Camara de Comercio de Nicaragua (Nicaragua Chamber of Commerce) in Managua, Nicaragua.  The Arbitrator will be designated by mutual agreement of the parties. If the parties do not agree, the Arbitrator can be designated by mutual agreement between the proposed arbitrators of the parties. In all cases, the ruling should be rendered by the arbitrator 60 days from appointment. Arbitration costs will be split in equal parts. Travel and legal expenses will be paid by the party with adverse ruling if applicable. Parties will have no right to appeal the decision.

## 6.13. ACCEPTANCE OF OFFER

IN WITNESS WHEREOF the Purchaser has executed this Offer to Purchase this __ day of _____, 200_, _____, _____.

    (City)        (Country)

**PRINT PURCHASER NAME: DARRELL BUSHNELL**


_____      _____

DARRELL BUSHNELL             Witness


IN WITNESS WHEREOF the Purchaser has executed this Offer to Purchase this __ day of _____, 200_, _____, _____.

    (City)        (Country)

**PRINT PURCHASER NAME: AMY BUSHNELL**


_____      _____

AMY BUSHNELL             Witness

Darrell Bushnell Amy Bushnell  22/12/2007  2:32:08 PM

- - 18 - -

The Vendor hereby accepts this Offer to Purchase on the terms, covenants and conditions contained herein, this ___ day of _____, 200_ in Managua, Nicaragua.

**VENDOR: SEASIDE MARIANA SPA & GOLF RESORT S.A.**

Per: _____          _____
       (Juan Rueda)

       Legal Representative                    Witness

## SCHEDULE "A"

Purchaser's Information:

Full Legal Name Darrell Lee Bushnell / Amy Bushnell

Full Legal Address 327 Santa Lucia, Granada, Nicaragua

La Flor Panameña

Occupation Pensionado

Marital Status Married

Citizenship USA

Cadula
Passport Number DB  047134  AB  047135

Email Bushamy23@yahoo.com  painterly.0900@yahoo.com

Telephone 505-616-7310  503-616-7322

Fax

- - 2 - -

# SCHEDULE B

## APPROVED ATTORNEY LIST

For Notary Services and Registration the Purchaser may use the following law firms:

1.- Consortium – Taboada & Asociados: Carlos Taboada Rodriguez: ctaboada@consortiumlegal.com

2.- García & Bodán: Federico Gurdian: federico.gurdian@garciabodan.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION

6.  This Court has jurisdiction pursuant to 28 USC 1332, there being diversity of citizenship and the amount in controversy exceeding $75,000 exclusive of fees and costs.

## VENUE

7.  Venue is proper in this Court because it is the agreed-upon-venue in Plaintiff's purchase contract, which Defendants have impeded with their wrongful actions.

8.  This case is about three related contracts ("the Contracts") to purchase property, including a condo and lots in Nicaragua ("the Properties"). The Bushnells as purchasers (in one of the two cases, via Pensco Trust and their IRA) signed two contracts ("the Two Bushnell Purchase Contracts") with identical compulsory arbitration provisions to purchase their lots and condos within the residential subdivision known as Seaside Mariana ("Exhibits A and B"). When the Bushnells had an issue with the owner of Seaside Mariana (the seller in their contracts) the Bushnells breached their contracts (that required arbitration) by proceeding directly to court, failing and refusing to arbitrate. They then improperly obtained judgment and filed a lien against not only the Properties but the full lands of Seaside Mariana.

9.  The third contract is Plaintiff's purchase contract to purchase Seaside Mariana. Plaintiff has obtained seller-financing for 80% of the purchase price from the owner of Seaside Mariana, and Plaintiff has arranged an investor to fund the other 20% and closing costs. Plaintiff wishes to keep the terms of his purchase confidential at the present time, but will

**COMPLAINT FOR BREACH OF
CONTRACT & SLANDER OF TITLE**

3

# NICARAGUA DEVELOPMENTS S.A.

## PROMISE OF SALE

### BETWEEN

## SEASIDE MARIANA SPA & GOLF RESORT S.A.

### (VENDOR)

### AND

## PENSCO TRUST COMPANY CUSTODIAN FBO DARRELL BUSHNELL IRA BU1DX

### (PURCHASER)





# OFFER TO PURCHASE

## SEASIDE MARIANA SPA & GOLF RESORT S.A.

## MUNICIPALITY OF SAN RAFAEL, NICARAGUA

Upon acceptance of this Promise by the Vendor, there shall be a binding agreement for the Purchase and Sale of the "Purchased Property" to be signed at the earliest possible time, the following working day after individual lot surveys have been approved by the Cadastre Office of Nicaragua, and all conditions required by Nicaraguan Laws are met.

**Between:**  **SEASIDE MARIANA SPA & GOLF RESORT S.A.**  **(the "Vendor")**

**And:**  **PENSCO TRUST COMPANY CUSTODIAN FBO DARRELL BUSHNELL IRA BU1DX**  **(the "Purchaser")**

**WITNESSETH THAT WHEREAS:**

A.    The Vendor is the proposed seller of freehold title to certain lands (the "Lands") situated in the Municipality of San Rafael, Nicaragua, and legally duly registered at the Property Public Registry of the Department of Managua under number: 4,251, that has been acquired by Seaside Mariana Spa & Golf Resort S.A. on October 21, 2006. From "The Lands", 8 lots are going to be divided and transferred by Seaside Mariana Spa & Golf Resort S.A. to the Purchaser, according to a master plan which will be ready and shown to the Purchaser no later than December 30, 2006. 4 lots considered will measure 60 feet wide and approximately 250 feet deep on the "Lands"; 2 lots considered will measure 70 feet wide and approximately 250 feet deep on the "Lands" and; 2 lots considered will measure 60 feet wide and approximately 150 feet deep on the "Lands". The above mentioned lots will be collectively known as the "Offered Lots" or "Purchased Property".

B.    The total package of lots will consist of the following type of lots within the master plan: 1-beach front lot; 1-ocean view lot (Ocean Side); 2- (250ft x 70ft) golf course lots (Mountain Side); 2 (250ft x60ft) golf course lot (Ocean Side); 2- (150ft x 60ft) golf course lots ( Ocean Side).

**Description of Ocean and Mountain Side (See Attachment of Topography)**

Ocean Side=Area located to the south of the future coastal highway that passes through the lands and the land nearer to the ocean front.

Mountain Side=Area located to the north of the future coastal highway that passes through the lands and the land nearer to the mountain

C.    The Purchaser offers to purchase all of the Vendor's right, title and interest in and to the "Offered Lots" and any other assets referred to herein on the terms and conditions hereinafter set forth.

Therefore, Seaside Mariana Spa & Golf Resort S.A. and PENSCO TRUST COMPANY CUSTODIAN FBO DARRELL BUSHNELL IRA BU1DX proceed to sign this Promise of Sale Agreement on the terms and conditions herein contained.

## ARTICLE 1 - PROMISE OF SALE

### 1.1. THE PURCHASED PROPERTY

The Vendor hereby agrees to sell to the Purchaser, or the natural person or entity designated by the Purchaser, on the terms and conditions herein contained, the following:

(a) A good and marketable freehold title of the "Offered Lots" in and to the Lands;

(b) Clear and free access from public roads to the "Purchased Property" over internal roads. Internal roads will be designed and built with appropriate drainage to allow year round access.

(c) Electricity connection to the "Purchased Property" provided by DISNORTE, a subsidiary of Union Fenosa, the Nicaraguan company responsible to provide adequate electricity service, as soon as possible. Tri-phase power will be specifically requested. The time DISNORTE takes in providing electricity connection after Seaside Mariana Spa & Golf Resort S.A. requests it, depends exclusively on DISNORTE. Seaside Mariana Spa & Golf Resort S.A. can not guarantee a specific date of connection.

(d) Fresh water service at the "Purchased Property" and rights to connect to this water system with adequate pressure as soon as possible. There will be a connection fee at time of hook up of USD $1,000.00 per lot. The time taken by the water service provider in hook up after Seaside Mariana Spa & Golf Resort S.A. requests it, depends exclusively on this provider. Seaside Mariana Spa & Golf Resort S.A. can not guarantee a specific date of connection.

(e) Telecommunications infrastructure that allows telephone and internet service connection at the "Purchased Property" as soon as possible. The time taken by the telecommunications service provider to complete the referred infrastructure after Seaside Mariana Spa & Golf Resort S.A. requests it, depends exclusively on this provider. Seaside Mariana Spa & Golf Resort S.A. can not guarantee a specific date of completion.

(f) The Vendor's interest under those service contracts which have been approved by the Purchaser in writing (the "Approved Service Contracts");

(g) Home Owner's Association membership. Home Owner's Association will start operating on September 1, 2008. The exact costs related to the Homeowner's Association can not be determined at this point, but it is expected that will cause an estimated annual fee of USD $1,500.00 per lot up to the year 2013. In this period the developer reserves the right to set the fee and it is not to exceed an annual fee of USD $3,000.00 per lot. Fees may vary between lots depending on area and location. These fees will not be payable until the "Purchased Property" as defined in this section is not completely delivered to the "Purchaser" in the agreed terms.

- 3 -

(h) Collectively, the "Purchased Property", free and clear of all liens, charges and encumbrances.

### The Purchase Price

The Purchase Price payable by the Purchaser to the Vendor for the "Purchased Property" shall be Two Hundred and Fifty Thousand United States Dollars (USD $250,000.00) the "Purchase Price", subject to the adjustments described herein. As this is an international transaction all amounts are United States Dollars.

## 1.2. PAYMENT OF THE PURCHASE PRICE

Subject to the adjustments described herein, the Purchase Price will be payable by the Purchaser to the Vendor as follows:

a) The sum of Two Hundred and Fifty Thousand United States Dollars (USD $250,000.00) is going to be deposited by the Purchaser no later than December 4, 2006, at the bank account designated by the Vendor.

b) All cost of fees associated with the transfer of land will be paid by the purchaser such as legal and taxes totaling on average 2.75% of the purchase price. These costs are described at Schedule C.

c) All other cost of fees associated with the transfer of funds will be paid by the purchaser such as bank fees or wire transfer fees. The costs charged by Nicaraguan banks when receiving funds are on average US $100.00 per transfer.

d) The attorney of record is the firm Consortium - Taboada & Asociados. Specifically, Carlos Taboada Rodriguez, who may work with other associates. He may be contacted at telephone number: 011-(505)-254 5454; email: ctaboada@consortiumlegal.com; Website www.consortiumlegal.com. Upon the title documents received from the seller of the Lands for examination Nicaragua Developments S.A. will retain the services of this firm to represent our interest in the transaction.

## 1.3. ADJUSTMENTS

Adjustments can be expected with respect to:

(a) taxes, registry fees, utilities, licenses or any other Government or Municipal charges related to this transaction;

(b) payments under the Approved Service Contracts;

In the event that the property taxes to be adjusted have not yet been determined by the local authority, then the taxes will be adjusted on the basis that the present years taxes will be ten (10%) percent higher than the past years taxes. Any tenant adjustments not finally determined at the date in which the "Purchase Closing Deed" is signed will be based upon reasonable estimated therefore supplied by the Vendor, and any readjustments will be promptly made following the final determination of such amounts.

## 1.4. PURCHASER

The Purchaser may designate one or more natural persons, corporations or other legal entities to serve as vehicles for the acquisition of the "Purchased Property".

In case local Nicaraguan Government, Municipal or Registry applicable laws and rules require, at the time of Closing, residency for foreigners to acquire land in Nicaragua, the Purchaser will designate one or more natural persons, corporations or other legal entities to serve as vehicles for the acquisition of the "Purchased Property".

## ARTICLE 2 - REPRESENTATIONS AND WARRANTIES

### 2.1. REPRESENTATION AND WARRANTIES OF THE VENDOR

The Vendor hereby represents and warrants to the Purchaser, with the intent that the Purchaser shall rely thereon in entering into this agreement and in concluding the purchase and sale contemplated herein, that as of the date hereof (unless otherwise specified) and the Closing Date in which the "Purchase Closing Deed" is signed (unless this agreement is earlier terminated):

(a)     Status of Vendor

  (i)     The Vendor is a Nicaraguan Corporation, Sociedad Anonima (S.A.) and has the power and authority to enter into this agreement and to carry out the transactions contemplated hereby;

  (ii)    The Vendor is the owner of the Lands from which the "Offered Lots" will be divided and sold to the Purchaser.

  (iii)   The Purchaser must comply with construction and zoning rules applicable within Seaside Mariana Spa & Golf Resort S.A. development within the lands, that will be provided by Nicaragua Developments S.A.

  (iv)    There is no claim or litigation pending or, to the knowledge of the Vendor, threatened with respect to the Vendor, the "Purchased Property" or the occupancy or use thereof by the Vendor which could affect the right of the Purchaser to own, occupy and obtain revenue from the "Purchased Property" or the ability of the Vendor to perform its obligations hereunder;

  (v)     Neither the execution of this agreement nor its performance by the Vendor will result in a breach by the Vendor, of any term or provision or constitute a default under any indenture, mortgage, deed of trust or any other agreement to which it is bound;

  (vi)    The Vendor is resident in Nicaragua within the meaning of the Income Tax Act of Nicaragua

  (vii)   At this time of closing, the Vendor has obtained Title Insurance Commitment for "the Lands" from First American Title Insurance Company. The Purchaser can request title insurance for the "Offered Lots" at Purchaser's expense.

(b)     Property Taxes

  (i)     There are no local improvement charges or special levies against the "Purchased Property" nor has the Vendor received any notice of any such proposed local improvement charges or special levies;

    (ii)    All municipal taxes, rates, levies and assessments with respect to the "Purchased Property" are paid in full or will be adjusted as provided under the heading "Adjustment" above and there is no pending appeal or other proceedings in respect of any such taxes, rates, levies and assessments;

(c)    There are no buildings nor leases on the Lands

(d)    The Approved Service Contracts

    (i)    A Nicaragua Development S.A. related company, or other, will provide services such as surveillance, gardening, road maintenance, among others, to every owner of lots located in the "Lands".

(e)    General

    (i)    Neither the "Purchased Property", nor any part thereof, has been expropriated or condemned, nor has the Vendor received any notice of any proposed expropriation or condemnation;

    (ii)    There are no collective agreements or proceedings under the Labour Code of Nicaragua involving the Vendor or its employees which would become an obligation of or be binding upon the Purchaser.

## ARTICLE 3 - COVENANTS

### 3.1. COVENANTS OF THE VENDOR

The Vendor hereby covenants and agrees with the Purchaser to:

(a) Cause the "Purchased Property" to be maintained and repaired and to effect such replacements thereto as may be required prior to the Closing Date in the manner of a prudent owner;

(b) Not enter into or amend any contract in respect of the "Purchased Property" including, without limitation, leases or service contracts, prior to the Closing Date without the prior written approval of the Purchaser;

(c) Grant authorizations reasonably required by Purchaser to authorize municipal and statutory authorities to release information confirming compliance with laws, by-laws and other statutory and governmental regulations and in respect of potential statutory liens;

(d) Pay as and when the same becomes due any indebtedness of the Vendor to any governmental authority which, by operation of law or otherwise becomes a lien, charge or encumbrance on the "Purchased Property" from and after the Closing Date, including without limitation, corporation capital taxes, municipal taxes, and workers' compensation payments;

(e) Not modify, amend or cancel any of the encumbrances agreed to herein without the prior written approval of the Purchaser;

(f) Provide the Purchaser with continuing access to the "Purchased Property" and to all records and other documents relating to the operation of the "Purchased Property" as are in the possession or control of the Vendor which are not delivered to the Purchaser on or before the Closing Date.

## ARTICLE 4 - RISK

### 4.1. THE PASSING OF RISK

The Lands shall be at the risk of the Vendor until completion of the Closing pursuant to the Closing Arrangements.

### 4.2. MATERIAL LOSS

In the event of a material loss or damage to the "Purchased Property" occurring prior to the passing of risk aforesaid, which cannot be substantially repaired or replaced prior to the Closing Date or failing this, within sixty (60) days from the date of occurrence, the Vendor shall give written notification to the Purchaser and the Purchaser may within seven (7) days following receipt of such notification, by notice in writing terminate this agreement, (in which case the deposit together with any interest will be paid to the Purchaser, and neither party shall be under any further obligation to the other) in default whereof the Purchaser shall be deemed to have elected to complete the Purchase in which case the proceeds and the right to receive the proceeds of all insurance shall be assigned by the Vendor to the Purchaser on the Closing Date and the Vendor shall have no responsibility to the Purchaser to repair the damage.

### 4.3. LOSS OR DAMAGE

In the event of loss or damage to the "Purchased Property" occurring prior to the passing of risk aforesaid, which can be substantially repaired or replaced prior to the Closing Date or failing this, within sixty (60) days from the date of occurrence, the Vendor shall diligently repair at its sole cost and expense any damage caused to the "Purchased Property" in a manner consistent with that of a prudent owner of similar property.

## ARTICLE 5 - CLOSING ARRANGEMENTS

### 5.1. THE CLOSING

The closing will take place when the "Purchased Property" is transferred to the Purchaser by means of the "Purchase Closing Deed". The closing procedure of the purchase and sale of the "Purchased Property" will commence as soon as the Property Public Registry of Managua completes registration of "The Lands" in Seaside Mariana Spa & Golf Resort S.A.'s name. The signature day will be the following working day after individual lot surveys for the "Offered Lots" have been approved by the Cadastre Office of Nicaragua (the "Closing Date"). In the event of Material Loss pursuant to the "Material Loss" article above, the Closing Date shall be deferred for seven (7) days. The rules contained in this Article 5 will apply.

The Purchaser must be duly represented by a natural person with a sufficient Power of Attorney to act on his behalf.



## 5.2. LOT DETERMINATION

The Vendor will provide the Purchaser a copy of the Master Plan, no later than December 30, 2006. The Purchaser will have to choose from the available lots on each area provided by the Vendor, the number of lots requested and agreed according to the Master Agreement. The Purchaser will have to notify the Vendor within forty eight (48) hours.

Each chosen lot will be surveyed and Seaside Mariana Spa & Golf Resort S.A. will start the process to obtain the approval from the Cadastre Office of Nicaragua, required to divide the lots from "the Lands" and proceed with the transfer of the "Offered Lots".

If individual Deeds (titles) are requested per each lot, the Purchaser will indicate so. Additional registry fees apply according to Schedule C.

## 5.3. DOCUMENTS OF THE VENDOR

On or before one week of the Closing Date, the Vendor will cause its solicitors to deliver to the Purchaser the following items, duly executed by the Vendor or any other party as appropriate and in registerable form wherever appropriate:

(a) Draft(s) of the "Purchase Closing Deed(s)", the Nicaraguan equivalent of an Estate in Fee-Simple, transferring the "Purchased Property" to the Purchaser free and clear of any lien, charge or encumbrance other than Permitted Encumbrances.

(b) A survey of the "Offered Lots" duly approved by the Cadastre Office;

(c) The Vendor's Statement of Adjustments if applicable;

(d) Assignments of any approved service contracts in form and substance satisfactory to the Purchaser, acting reasonably if applicable;

(e) An assignment of any licenses or permits required in connection with the operation of the Lands if applicable;

(f) Such further deeds, acts, things, certificates and assurances as may be required in the opinion of the Purchaser, acting reasonably, for more perfectly and absolutely assigning, transferring, assuring to and vesting in the Purchaser title to the Purchased Property, free and clear of any lien, charge and encumbrance other than Permitted Encumbrances;

## 5.4. PREPARATION OF CLOSING DOCUMENTS

The closing documents contemplated above will be prepared by the Vendor's solicitor (to the extent that preparation is required) and delivered to the Purchaser at least one week prior to the Closing Date, with the exception of the Public Deed. Regarding the Public Deed, a Draft will be provided at least one week prior to the closing. Vendor's solicitor will be the firm of record: Consortium - Taboada & Asociados. Specifically, Carlos Taboada Rodriguez. He may be contacted at phone number: 011-(505)-254 5454; email: ctaboada@consortiumlegal.com; Website www.consortiumlegal.com.



## 5.5. CLOSING PROCEDURE

Closing will take place once the survey's from the selected lots are duly approved by the Cadastre Office. Closing will be executed with the transfer of the "Purchased Property" from Seaside Mariana Spa & Golf Resort S.A. to the Purchaser by means of the "Purchase Closing Deed". The Vendor and the Purchaser, duly represented, will sign this "Purchase Closing Deed", before the attorney of record, Consortium – Taboada & Asociados, which will provide the Purchaser copy of the Testimony.

**Concurrent Requirement**

It is a condition of the Agreement that all requirements relating to Closing referred to above are deemed to be concurrent requirements and it is specifically agreed that nothing will be completed on the Closing Date until everything required to be paid, executed and delivered on or before the Acquisition Date, and on or before the Closing Date has been so paid, executed and delivered.

## 5.6. PAYMENT OF FEES AND POSSESSION

The Purchaser shall bear 100% of the costs of the conveyance and Nicaraguan Property Transfer Tax and Registry Fees. The Vendor shall deliver vacant possession of the "Offered Lots" to the Purchaser on the Closing Date subject only to the Permitted Encumbrances. The Purchaser shall bear the costs of title insurance for the "Purchased Property", if desired.

## 5.7. POST CLOSING PROCEDURES

The following working day after Closing, as long as transfer costs are provided and received by the Vendor, the attorney of record, Consortium – Taboada & Asociados, will start registration process of the "Purchase Closing Deed(s)".

The following working day after registration is obtained, the attorney of record, Consortium – Taboada & Asociados, will send the Purchaser via courier the original title(s) at buyer's expense.

## 5.8. CLOSING DELAYS

The Vendor cannot guarantee registration of the "Lands" or approval of individual lot surveys on or before certain dates, since Public Offices in Nicaragua do not guarantee this services for specific dates. In any case, as soon as the requirements are met, The Vendor offers to complete the Closing on the next working day after individual surveys are approved by the Cadastre Office. The Vendor will not assume any liability or responsibility for third party delays.



- 9 -

## ARTICLE 6 - GUARANTEES

This Agreement will contain the following guarantees for the Purchaser:

### 6.1. REFUND RULES

In case of liquidation of Seaside Mariana Spa & Golf Resort S.A., or event that in a twenty four (24) month period from this date results in permanent impossibility to develop the master plan, Seaside Mariana Spa & Golf Resort S.A. will sell the land and provide with this sale's funds, priority refund of the amount provided at such time by the Purchaser, to the Purchaser, up to Two Hundred and Fifty Thousand United States Dollars (USD $250,000.00) refund.

### 6.2. HOME OWNERS ASSOCIATION FEES WAIVERS

If Seaside Mariana Spa & Golf Resort S.A. fails to comply with sections 1.1 or 3.1 of this Promise of Sale Agreement, at Purchaser's choice, a complete refund will be provided to the Purchaser by Seaside Mariana Spa & Golf Resort S.A. or; the Purchaser will have the right to pay a reduced percentage of the Home Owner's Association fees according to the percentage of completion of infrastructure at the "Purchased Property", according to Schedule B.

Any refund referred to in this Section will be provided by Seaside Mariana Spa & Golf Resort S.A. in the proportion of the number of lots, all lots being considered in equal proportion, held in property by the Purchaser at the time the refund is paid. When a refund is paid, the Purchaser will transfer back the lots subject of refund to Seaside Mariana Spa & Golf Resort S.A. by means of a Public Deed of Purchase in which the refund will be considered the price, to comply with Nicaraguan Law.

### 6.3. SEASIDE MARIANA SPA & GOLF RESORT S.A. SHARES

Grupo Mariana S.A., the majority shareholder of Seaside Mariana Spa & Golf Resort S.A., has agreed to put on Escrow 246 shares of the total 10,000 shares of Seaside Mariana Spa & Golf Resort S.A. stock as guarantee to complete the transfer of the Offered lots according to the agreed terms of this Promise of Sale Contract, by means of a Pledge Agreement signed between Grupo Mariana S.A. and  PENSCO TRUST COMPANY CUSTODIAN FBO DARRELL BUSHNELL IRA BU1DX , according to the terms contained on Section 1.2 m) of the Master Agreement.

### 6.4. PUBLIC INSTRUMENT

If the Purchaser visits Nicaragua before the Closing, or, is duly represented in Nicaragua by a holder of a duly authenticated Power of Attorney, at Purchaser's request, the Vendor will sign a Public Instrument containing the essential terms of this Promise of Sale according to Nicaraguan Law, including property description, price information, and conditions.

## ARTICLE 7 - MISCELLANEOUS

### 7.1. TIME AND TENDER

Time shall be of the essence of this agreement and the transactions contemplated herein. Any tender of documents or money may be made upon the party being tendered or upon its solicitors; money may be tendered by certified cheque or solicitors trust cheque or by cash, payable in United States of America funds or as provided herein.

### 7.2. RELATIONSHIP OF THE PARTIES

Upon acceptance of this Offer by the Vendor there shall be a binding agreement for the purchase and sale of the "Purchased Property" between the Purchaser and the Vendor in accordance with the terms and conditions hereof.

### 7.3. NOTICE

All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally or facsimile or may be forwarded by first class prepaid registered mail to the addresses set forth below. Any notice delivered or sent by e-mail or facsimile shall be deemed to have been given and received at the time of delivery. Any notice mailed as aforesaid shall be deemed to have been given and received on the expiration of five (5) business days after it is posted or addressed to the any direction included in Schedule A or addressed as follows:

(a)    to the Purchaser at:

      Attention:      PENSCO   TRUST   COMPANY   CUSTODIAN   FBO   DARRELL BUSHNELL IRA BU1DX                       e-mail: bushamy13@yahoo.com

(b)    to the Vendor at: Seaside Mariana Spa & Golf Resort S.A.

      Attention:      Kevin Fleming        e-mail: kevin@nicaraguadevelopments.com

Provided that any party shall be entitled to designate another address by giving notice thereof to the other party in accordance with the terms hereof, any notice so mailed shall be deemed to have been received, except during a period of interruption of normal postal service, on the fourth business day following the date of mailing in the city of Managua, Nicaragua.

### 7.4. SUCCESSORS AND ASSIGNS

This Agreement shall ensure to the benefit of and are binding upon the parties hereto, their respective heirs, executors, administrators and other legal representatives and, to the extent permitted hereunder, their respective successors and assigns.

### 7.5. EXTENDED MEANINGS AND HEADINGS

Words importing the singular number include the plural and vice versa and words importing the masculine gender include the feminine and neuter genders. The headings are for convenience of reference only and shall not effect the construction or interpretation of this agreement.

## 7.6. APPLICABLE LAW

This agreement shall be interpreted in accordance with the laws of Nicaragua. For the entire Agreement and Schedules

This agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and contains all of the representations, and warranties, covenants and agreements of the respective parties, and may not be amended or modified except by an instrument in writing executed by all parties. This agreement supersedes all prior agreements, memoranda and negotiations between the parties. The Schedules attached hereto form part of this agreement.

## 7.7. BUSINESS DAY

(a) "Business Day" shall mean a day on which the Property Public Registry in which title to the "Purchased Property" is registered is open for business;

(b) In the event that the Property Public Registry is not open for business on the Acquisition Date or Closing Date, these Dates shall be the next day the Property Public Registry is open for business.

## 7.8. TIME AND FURTHER ASSURANCES

All times herein refer to current Nicaraguan Time. Each of the parties shall, at the cost and expense of the other party, execute and deliver all such further documents and do such further acts and things as the other party may reasonably request from time to time to give full effect to this agreement.

## 7.9. NON-MERGER AND INSPECTIONS

None of the provisions of this agreement shall merge in the transfer of the "Purchased Property" or any other document delivered on the Closing Date and the provisions of this agreement shall survive the Closing Date. From the date of acceptance of this Offer, the Purchaser shall have the right to inspect and survey the "Offered Lots" and carry out reasonable tests.

## 7.10. FORCE MAJEURE

For the purposes of the agreement arising from the acceptance of this Offer, "Event of Force Majeure" means, but is not limited to, acts of God or of the public enemy, wars, declared or undeclared, revolution, riot, insurrection, civil commotion, fires, floods, storms, slides, epidemics, quarantine restrictions, strikes or lock-outs, including illegal work stoppage or slow downs, freight embargoes or power failure; provided that any such event or circumstances is a major disabling event or circumstances which is beyond the reasonable control of the party affected and results in a material delay, interruption or failure by the affected party in carrying out its duties, covenants or obligations under the agreement formed by the acceptance of this Offer. No lack of money, financing or credit shall be deemed to be an Event of Force Majeure.

If an Event of Force Majeure occurs or is likely to occur, the party directly affected shall promptly notify the other party of the particulars of the relevant event or circumstances and, if possible, supply supporting evidence.

The party so affected shall use its best efforts to remove, curtail or contain the cause of the delay, interruption or failure and to resume with the least possible delay compliance with its duties, covenants and obligations under the agreement formed by the acceptance of this Offer. Neither party shall be liable to the other for any delay, interruption or failure caused by an Event of Force Majeure, and the date specified herein for the performance of such duties, covenants or obligations hereunder shall be postponed for a period equal to the delay occasioned by such Event of Force Majeure.

## 7.11. CONFIDENTIALITY

This Agreement, together with any other private Agreement between the parties, as well as any other document, electronic file, picture or image provided by Nicaragua Developments S.A., Seaside Mariana Spa & Golf Resort S.A., and related companies, regarding the development of "The Lands" and the aforementioned Agreements is deemed confidential and cannot be disclosed to third parties without the written consent of Nicaragua Developments S.A.

## 7.12. ARBITRATION

Any conflict arising from the interpretation, execution or breach of this Agreement shall be resolved by Arbitration, held before an Arbitration Center located in Miami, Florida, United States of America. American Arbitration Association rules will apply. The Arbitration Center and the Arbitrator will be designated by the American Arbitration Association within five (5) of request by any of the parties. In all cases, the proposed arbitrators must be Florida arbitration practitioners. In all cases, the ruling should be rendered by the arbitrator 60 days from appointment. Arbitration costs will be split in equal parts. Travel and legal expenses will be paid by the party with adverse ruling. Parties will have no right to appeal the decision.

## 7.13. ACCEPTANCE OF PROMISE

IN WITNESS WHEREOF the Purchaser has executed this Promise of Sale this 28 day of November, 2006, Managua, Nicaragua.

**PENSCO TRUST COMPANY CUSTODIAN FBO DARRELL BUSHNELL IRA BU1DX**

Per:

PENSCO TRUST COMPANY CUSTODIAN

FBO DARRELL BUSHNELL IRA BU1DX                    Witness

The Vendor hereby accepts this Promise of Sale on the terms, covenants and conditions contained herein, this 28 day of November, 2006 at Managua, Nicaragua.

**SEASIDE MARIANA SPA & GOLF RESORT S.A.**

Per:      *MRueda*

(Maria Rueda)

President                                          Witness

## SCHEDULE "A"

Please deliver with this offer the following information to begin proper documentation and registration of your property.

Full Legal Name____Darrell  Lee  Bushnell____

Full Legal Address__1646  west  Highway  160  Suite 8165__

_____Fort  Mill ,  SC  29708  U.SA._____

Occupation_____Operations  Manager_____

Marital Status_____Married_____

Citizenship_____USA_____

Passport Number____210647469_____

Email_____bushamy13@ yahoo.com_____

Telephone___505-668-3846_____Nicaragua____

Fax_____N/A._____



## SCHEDULE "B"

To calculate the percentage of completion of infrastructure referred to in section 1.2 g) c), the following rules will apply:

1.- Infrastructure considered per lot includes:
a.- Electricity connection;
b.- Water connection;
c.- Telecommunications access;
d.- Internal access roads to the lots.

2.- Each infrastructure item will have equal value in terms of completion or non-completion. This value will be assigned upon completion per lot:
a.- Electricity connection access: 25%;
b.- Water connection access 25%;
c.- Telecommunications access 25%;
d.- Internal access roads to the lot 25%.

3.- Starting on August 2008, each trimester Nicaragua Developments S.A. will provide information regarding infrastructure completion per lot, establishing the percentage on completion to determine the Home Owner's Association Fee.



## SCHEDULE "C"

Closing costs considered for this Promise of Sale:

1.- Property transfer tax: 1% of Purchase Price.

2.- Registry fees: US \$300.00 for registration of the "Closing Public Deed". If Purchaser requires individual Public Deed (Titles) for each lot, or group of lots, US \$300.00 must be provided for each additional Public Deed to cover additional registry fee expenses.

3.- Notary Fees: 0.75% of the Purchase Price for "Closing Public Deed" drafting and Notary service.

If multiple "Closing Public Deeds" are requested related to this Agreement, no additional legal fees will be charged.

4.- Legal Fees: 0.75% of the Purchase Price for the following services:

a.- Master Agreement;

b.- Escrow Account service;

c.- Promise of Sale;

d.- Legal services for the approval of individual lots at the Cadastre Office;

e.- Legal services in payment of transfer tax;

f.- Legal services to obtain Cadastre Certificate;

g.- Registration of the "Closing Public Deed".

If multiple "Closing Public Deeds" are requested related to this Agreement, no additional legal fees will be charged.



EXHIBIT C

SERIE "P"

No. 0343923

SEÑOR (A) REGISTRADOR (A) PÚBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL DE LA CIUDAD DE MANAGUA, YO JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD, ABOGADO Y NOTARIO PÚBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD DE GRAVAMEN DE LA FINCA NUMERO (4,251-PH), TOMO NÚMERO (47/49-PH), FOLIO NUMERO (31/300-166-PH), ASIENTO PRIMERO (1) DE LA COLUMNA DE INSCRIPCIONES DE LA SECCIÓN DE DERECHOS REALES, LIBRO DE PROPIEDADES REGISTRO PUBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL DEL DEPARTAMENTO DE MANAGUA

Managua, jueves 13 de noviembre del 2017

Jairo M

Abogado y Notario Publico

Carné No 11516

**LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA:** Que la finca inscrita bajo el **No. 4251-PH; Tomo 47PH; Folios 31-300; Tomo 49PH; Folios 1-66; Tomo 136PH, Folios 91-104; Asientos 1-2.** Columna de Inscripciones, sección de Derechos Reales, Libro de Propiedades Horizontales de este Registro Publico. **Pertenece el resto a: Seaside Mariana Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis Lyonette**, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: 1) Trescientos sesenta y tres mil ochocientos cincuenta y dos dolares equivalente a siete millones ochocientos noventa y cinco mil quinientos ochenta y ocho córdobas con cuarenta centavos de córdobas; 2) Cuatrocientos tres mil seiscientos noventa y tres dolares equivalente a ocho millones setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas, para un monto total de Dieciséis millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a setecientos sesenta y siete mil quinientos cuarenta y cinco dolares, posteriormente se amplio dicho crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil seiscientos setenta y tres córdobas con treintiun centavos

equivalente a un millón ciento cuarenta y un mil trescientos cuarenta seis dolares. **En asientos 1-2 de hipotecas. También tiene inscritas Provisionalmente venta de los siguientes lotes indivisos: 1)** A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; **2)** A favor de Trevin Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; **3)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; **4)** A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; **5)** A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; **6)** A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; **7)** A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; **8)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; **9)** A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **10)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; **11)** A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; **12)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; **13)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; **14)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **15)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; **16)** A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área un mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; **17)** A favor de Robert Daniel Madgett

y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **18)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; **19)** A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; **20)** A favor de Thomas Edward Austin,  identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; **21)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ,  con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; **22)** A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; **23)** A favor de Trevin Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; **24)** A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; **25)** A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **26)** A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados;  **27)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; **28)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; **29)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **30)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; **31)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; **32)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote  GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; **33).-** Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. **37)**

Tiene anotada **Dacion en Pago** a favor de los señores: **Edward Albert Cole,** los siguientes lotes: 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de: un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco metros cuadrados, 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento

cuarenta y dos  metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos

punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y

ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta

y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil

seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de  cuatro

mil  doscientos veintiún  punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS,  con un área

de  tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35)  Lote GCF,

con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36)

Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros

cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta

metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos

ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto

novecientos veinte metros cuadrados,  40) Lote GCK, con un área de dos mil cuatrocientos dieciséis

punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos

cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de

dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un

área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros

cuadrados, 45) Lote No.24, con un área de doce mil ochocientos cuarenta y dos  punto doscientos

veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve

punto seiscientos sesenta y ocho metros cuadrados. **Promesa de venta,** a favor de PKR Holding,

Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y

dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos

treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un mil

cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres

millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de

córdobas. **Promesa de venta,** a favor de Advantage Ventures LLC, un lote con un área de un mil

trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos

millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos,

equivalente a ciento nueve mil quinientos dolares. **Promesa de venta** a favor de Paul Brian  Cicerl, un

lote de terreno identificado como GAV, con un  area de un  mil cuatrocientos siete punto ochocientos

setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas

equivalente a veintinueve mil trescientos ochenta y dos dolares. **Demanda,** ordinaria con acción de

resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que  se deje sin efecto el

contrato de oferta de compra sobre el lote OVGG, b) que  se deje sin efecto el contrato de oferta de

compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y

perjuicios ocasionados por el incumplimiento. **Demanda** en la vía ordinaria con acción de resolución de

contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de

promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios

ocasionados por el incumplimiento. **Demanda** ordinaria con acción de resolución de contrato por

incumplimineto, promovida por Darrell Lee y Bushnell y Amy Bushnell **Demanda** ordinaria con acción

de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1063 Pr. Declareseles

rebeldes para todos los efectos de la presente demanda. A solicitud de parte interesada extiendo el

presente certificado en la ciudad de Managua a diecisiete dias del mes de noviembre del dos mil

diecisiete.

Domingo de la Concepción Espino